UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANO IVEZAJ,

Plaintiff,

v.

Case Number 14-12286
Honorable David M. Lawson

DETROIT PUBLIC SCHOOLS, KAREN RIDGEWAY, LAURI WASHINGTON, and SHIRLEY MOBLEY WOODS,

Defendants.

___________________________________/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING COUNT II OF THE AMENDED COMPLAINT**

Plaintiff Frano Ivezaj, an American citizen with Albanian heritage, alleges in an amended complaint that he was terminated from his administrative position with the Detroit Public Schools and given a teaching position — at substantially lower pay and responsibility — because of gender and national origin discrimination, he was denied procedural due process, and the school district breached its contract with him. The defendants — the school district and some of its supervisory personnel — respond that Ivezaj was terminated because of serious violations of district rules and policies. After an extensive and contentious period of discovery, the defendants filed a motion for summary judgment. The Court heard oral argument on August 13, 2015, and concludes now that the plaintiff has not brought forth evidence that creates a jury-submissible claim on any of the theories of liability identified in his amended complaint that were challenged by the defendants. Therefore, the Court will grant the defendants' motion for summary judgment and dismiss Count II of the amended complaint.

I.

Plaintiff Frano Ivezaj describes himself as an Albanian American citizen of the United States. He was employed by defendant Detroit Public Schools for 27 years, receiving excellent performance evaluations throughout that time, which included 15 years as a teacher and 12 years as a school administrator. As an administrator, he worked for six years as a high school assistant principal, four years as a K-8 principal, and two years as an assistant superintendent. Throughout his tenure, he was never subjected to any disciplinary hearing before June 12, 2012. During the final two years of his career as an administrator, he was an assistant superintendent responsible for overseeing 20 schools and also oversaw the Department of Multicultural-Multilingual Education within DPS. Defendant Shirley Mobley-Woods completed a Performance Evaluation Report on June 21, 2012, in which she marked Ivezaj's performance as "exceptional" or "commendable" in each of the twenty specific categories provided for evaluation.

Ivezaj was employed by the school district under an employment contract with a term starting July 1, 2012 and ending June 30, 2013. Under the terms of the contract, Ivezaj agreed that he "must comply with all policies and procedures and Work Rules of the District," and the agreement provided that he could be terminated for just cause, including for "violations of Work Rules and District policies and procedures, and poor job performance." The agreement stated that other grounds of termination for cause could include: (1) "misconduct in office"; (2) "fraud"; and (3) "violation of any District policies, procedures, or directives, including . . . failure to disclose [] conflicts or potential conflicts." The agreement further stated that the "Employee is subject to, and agrees to abide by, all conflict of interest and ethics policies of the District." All of these provisions eventually came into play in the disciplinary hearing that resulted in the plaintiff's termination.

Although the plaintiff received stellar performance evaluations, all of that changed in the fall of 2011, after defendant Karen Ridgeway was appointed as Superintendent of Academics for defendant Detroit Public Schools in July 2011. The plaintiff was accused of several contract and district policy violations and, after a hearing, he was fired from his administrative position. He was given a teaching position at a substantially reduced salary.

In his amended complaint, Ivezaj alleges three counts against all of the defendants, including the Detroit Public Schools. Count I is labeled "Section 1983 Discrimination," but its content does not discuss any sort of discrimination; instead it pleads a claim for denial of procedural due process. Count II appears to plead a claim of national origin and gender discrimination, citing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Michigan Elliott–Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.* Count III alleges that the "defendants" breached the plaintiff's employment contract. Among the defendants, Karen Ridgeway was appointed as Superintendent of Academics for defendant Detroit Public Schools in July 2011. Ridgeway appointed defendant Shirley Mobley-Woods as her Academic Chief of Staff, and in that position Ms. Mobley-Woods directly supervised the District's six Assistant Superintendents, including the plaintiff. Defendant Lauri Washington is the Executive Director of the District's Human Resources division. Defendant Marilyn Beard, who never was served in this case, is a former Special Investigator in the District's Office of the Inspector General.

In their motion, the defendants attack only count II of the amended complaint, contending that the plaintiff cannot establish that his termination was based on national origin or gender discrimination, and the school district had several good reasons for its termination decision. Those reasons, as disclosed by the evidentiary record, are discussed below.

A. Termination

In October 2011, defendant Ridgeway conveyed to the District's Office of the Inspector General a report by Sheryl Jones, Director of the Office of Social Studies, that she witnessed the plaintiff engaging in violations of the Whistleblower Act, when he discussed possible fundraising activity that could violate District policies. Subsequently, defendant Beard questioned more than 20 witnesses about a variety of alleged improprieties in the defendant's conduct as a superintendent, and her investigation culminated in formal charges and a hearing.

On June 12, 2012, the defendant appeared at a disciplinary hearing before DPS Human Resources Assistant Director Mary Anderson. Present at the hearing were the plaintiff and his counsel of record, defendant Ridgeway, defendant Beard, and witnesses Tracy Joshua, Gwendolyn Washington, Gregory Stokes, Jacquelyn Benson, Sheryl Jones, Marcia Jenkins, Claudia Lara-Martinez, Juan Patino, Teresa Wesley, and Leticia Rangel (all employees of the District in various positions). The hearing officer considered the testimony of each of the witnesses present at the hearing, more than forty items of documentary evidence, and the plaintiff's own testimony as well as his responses to the charges and the arguments of his attorney in support of his position. Hearing officer Anderson prepared a written summary of the testimony and evidence presented, and her findings and conclusions from the hearing. Defendant Washington then discussed the written findings with Anderson and the two agreed on a recommendation that was presented, with the report from the hearing, to Vicki Hall, the Chief Human Resources Officer for the District. Ms. Hall reviewed the record of the hearing and made the final decision approving the recommendation to terminate the plaintiff's contract.

On July 27, 2012, a letter on the letterhead of Ms. Hall, setting forth the findings from the disciplinary hearing and signed by defendant Washington, was sent to the plaintiff and his attorney. The letter advised the plaintiff that his administrative employment contract was canceled immediately, and that if the plaintiff held a current teaching certificate the District was prepared to offer him a teaching position for the 2012-13 school year. It is undisputed that the plaintiff accepted the offered teaching position and continued in that role until he retired from DPS with 32 years of service in July 2013.

The specific charges raised at the disciplinary hearing and the hearing officer's findings as to each of them are discussed below.

1. Contracting and Procurement Policy

The hearing officer concluded that the plaintiff had violated the District's contracting and procurement policy by, among other things: (1) attempting to increase the purchase allocation for a foreign language program in Mandarin Chinese to be provided by MyLanguage360 Corporation from $6,000 to $44,000, without following the usual contracting and bidding procedures or engaging the District's Office of Contracting and Procurement; (2) attempting to bypass the Request for Proposal process eventually set up for the Chinese language program by sending an unauthorized email to District principals informing them of the availability of the MyLanguage360 Corporation's program, just one day after the RFP inviting vendors to bid on providing such a program was opened; (3) purporting to inform the Office of Contracting and Procurement in May 2011 that the MyLanguage360 program had been selected from among the RFP applicants, without providing any explanation as to the basis for the selection; and (4) after the competing bidders demonstrated their products for evaluation in July 2011, informing the president of MyLanguage360 Corporation of the

score assigned to the company's product by evaluators and advising him that his company may want to adjust the pricing of its proposal in order to secure the bid. Ivezaj denied violating the contracting and procurement policy, contending that he did not disclose any confidential information relating to product evaluations or competitive bid pricing, and that the only conversations he had with representatives of the MyLanguage360 Corporation were at the behest of and approved by Ridegeway's predecessor, Dr. Barbara Byrd-Bennett.

2. Payroll Fraud

The hearing officer concluded, based on reports from officers of Canadian Customs, that the plaintiff was seen entering Canada on August 2, 2011, a day for which he received his full regular pay, and he did not report his time for the day as vacation or notify his supervisor that he was absent from work. The plaintiff admitted that he was in Canada August 2, 2011 to help his friend Tom Nicaj by acting as a translator, but he contends that he had no reason not to report the absence, because he could have taken a sick day, and he had more than 300 days of sick time accumulated. On June 6, 2012, the plaintiff submitted a correction to his time sheet to record the absence as a sick day, but he does not contend that he was ill on the day in question.

3. Nepotism and Conflict of Interest Disclosure

The hearing officer concluded that the plaintiff violated the District's policies on nepotism and conflicts of interest disclosure by repeatedly misrepresenting or concealing that his niece, Liria Ivezaj, was related to him, when she applied for and eventually was hired to a position in the Department of Multicultural-Multilingual Education that the plaintiff oversaw. The hearing officer found that, on March 2, 2011, the plaintiff emailed Gregory Stokes in the District's Human Resources division and asked him to add the name of Liria Ivezaj to the eligibility pool for hiring

as a Bilingual Education Technician in the Department of Multicultural-Multilingual Education. The plaintiff later provided an authorization number to Mr. Stokes for the hiring of Ms. Ivezaj to the Bilingual Education position.  Liria Ivezaj asserts that she found the job and applied for it without her uncle's knowledge, but the hearing officer found, and the plaintiff does not deny, that Ms. Ivezaj sent an email to the District's Human Resources division on March 2, 2011 stating that the plaintiff "(no relation to me, common last name)" had told her that she should inquire about the Bilingual Education position.  Ms. Ivezaj admits that after she applied for the job, she discussed the district's anti-nepotism policy with her uncle and asked if it would be a problem, and he told her that as long as she did not directly report to him it would not be a problem.

The plaintiff does not dispute that he recommended to Stokes that the district should hire Ms. Ivezaj, or that he later provided an authorization number for her hiring.  When a supervisor in the HR division became suspicious of Mr. Ivezaj's recommendation, he directed Stokes to inquire with Mr. Ivezaj if the two were related.  On March 17, 2011, Ivezaj stated in an email to Stokes, "consistent with the DPS Conflict of Interest Policy, this is to certify that Liria Ivezaj is not related to me."  However, in a 2012 email to defendant Ridgeway, concerning his niece's assignment in the Department of Multicultural-Multilingual Education, Ivezaj stated that he "may have misinterpreted the [conflict of interest] policy" because "it does not list niece as a relative."  The plaintiff asserts that he never supervised his niece and she reported to the principal at the school where she worked. In her own affidavit, Liria Ivezaj stated that she was hired by the district and assigned to the Farewell school, which was not one of the schools overseen by the plaintiff, and that she never reported to the plaintiff.

Ivezaj contends that his alleged violations of the nepotism and conflict of interest policies were handled differently than similar issues with his colleagues, because his fellow assistant superintendent, Rebeca Luna, "had four immediate family members employed with the Detroit Public Schools, two immediate sisters, a daughter, and a nephew, both of which [sic] she supervised in the schools where they worked under her." Frano Ivezaj aff. ¶ 3(x).

The DPS Conflict of Interest Policy states that "[i]t is the policy of the Detroit Public Schools that all [] employees shall report any actual or potential conflicts of interest, questions of conflicts of interest, or the appearance of conflicts of interest in accordance with this policy for prompt resolution." The policy imposes a duty on all employees to "disclose any actual or potential conflicts of interest or matters that may give the appearance of a conflict of interest" at the time of hiring and throughout their term of employment, and it states that "[i]t is the responsibility of each Board member and each employee to report any actual conflicts of interest, potential conflicts of interest or the appearance of a conflict of interest prior to their occurrence or immediately upon becoming aware of the conflict of interest." The policy states that violations could lead to disciplinary action including termination.

As to "Nepotism," the policy states in particular that "[a]t no time may any . . . employee be directly responsible for the supervision or evaluation of a member of his or her immediate family, domestic partner, relative, and/or significant other." The term "relative" under the anti-nepotism policy is defined to mean "a spouse, child, parent, sibling, grandparent, aunt, uncle, first cousin, or corresponding in-law or step-relation."

The plaintiff's employment contract contains a somewhat stricter specific prohibition on nepotism. Under the section headed "responsibilities," the contract states that:

> Employee shall not *directly or indirectly supervise* any member of Employee's Immediate Family. For purposes of this Agreement, "Immediate Family" shall be defined as mother, father, sister, brother, son, daughter, first cousin, nephew, *niece*, significant other or any person residing with Employee. In the event a member of Employee's Immediate Family is assigned to Employee's work location (or may be subject to Employee's supervision, even if not at the same location) as a result of hiring, reorganization or transfer, Employee, in writing, shall immediately notify Employee's direct supervisor and the District Department of Human Resources for resolution.

Administrative Employment Agreement 2012-13 ¶ 4.3 (Pg ID 687) (emphasis added).

4. Unauthorized Promotion and Use of State Funds

The hearing officer concluded that the plaintiff used state funds without authorization by providing an invalid PCN number to Gregory Stokes of the District Human Resources division, which was used to promote his administrative assistant to a Bilingual Executive Assistant — Technical Level IV, despite the fact that the plaintiff had earlier been informed that no funds were available to fund such a position. The plaintiff contends that the Office of Budget and Compliance has "glitches" in its system and he thought that the PCN number he used was valid.

5. P-Card and Sam's Club Card Purchasing Policy

The hearing officer concluded that the plaintiff violated District policies governing the use of the "P-Card" (presumably a type of credit card) issued to him by making more than $1,000 in purchases of personal or prohibited items between August 19, 2011 and March 6, 2012. The District's policy requires that all personal or prohibited purchases using the P-Card must be reported to the Office of Purchase Card Management and reimbursement in full paid by the employee within 48 hours of any such purchase. The plaintiff admitted at the hearing that he used his P-Card to purchase personal and unauthorized items, but that he intended to repay the District for those purchases. However, he does not dispute that he reimbursed the District for the "mistaken"

purchases several months after some of the disputed charges were made on his card, and only when he was informed that his card was suspended and was ordered to reimburse the District for the unauthorized line items.

The hearing officer further concluded that the plaintiff violated the policy on use of a tax-exempt Sam's Club membership card issued in his name, under the authority of the District, by using the card to purchase personal items at Sam's Club between February 27, 2011 and March 27, 2012. The plaintiff contends that he was surprised to learn on March 27, 2012 that a copy of a Sam's Club card in the plaintiff's name, but bearing the photograph of Tom Nicaj, a friend of the plaintiff's, had been issued by Sam's Club. Upon learning that the unauthorized card had been issued in his name, the plaintiff filed a police report with the City of Madison Heights Police Department. The plaintiff contends that he did not make any of the purchases that were recorded as improper uses of the Sam's Club tax-exempt membership card.

6. Failure to Report Conviction

The hearing officer concluded that the plaintiff violated the School Safety Act, 2005 P.A. 129-131, 138, Mich. Comp. Laws § 380.1230d, by failing to report to the district, within three business days, his October 15, 2008 conviction for Operating a Vehicle While Impaired. That statute states that if any school district employee "is charged with a crime listed in section 1535a(1) or 1539b(1) or a violation of a substantially similar law of another state, a political subdivision of this state or another state, or of the United States," the employee must submit a written report of the crime charged within "3 business days after being arraigned for the crime." Mich. Comp. Laws § 380.1230d(1). The enumerations in sections 1535a and 1539b, Mich. Comp. Laws § 380.1535a, 1539b, do not specifically include operating a vehicle while impaired. The plaintiff does not dispute

the hearing officer's finding that he pleaded guilty to the charge and received a sentence of six-months probation. However, the plaintiff's criminal history report indicates that the conviction was for a misdemeanor offense, and the District policy on reporting "listed offenses" under the School Safety Act does not include operating while impaired under the enumeration of "listed misdemeanors" that must be reported.

7. E-Mail and Password Security Policy

The hearing officer concluded that the plaintiff provided his email password to his administrative assistant, contrary to the District's policy regarding password security. The plaintiff admitted that he gave his password to his clerical assistant, Marcia Jenkins, because he was responsible for supervising twenty-four principals and needed her to review and prioritize incoming emails, which was a practice that he had observed other assistant superintendents following.

8. Staff Intimidation and Obstructing OIG Investigation

The hearing officer concluded that the plaintiff intimidated staff and interfered with the Office of Inspector General (OIG) investigation by discussing its progress with Gregory Stokes (of the Human Resources division), and Cheryl Jones and Viviana de Bonafede (direct reports under the plaintiff's supervision), and asking those employees what questions the OIG investigator had asked them. The plaintiff also told Ms. de Bonafede that his "job was on the line," asked her to review favorable letters written by other staff members to be presented for his benefit at the hearing, and told her that she was the only member of his staff that refused to discuss with the plaintiff her encounter with the OIG investigator. Gregory Stokes and Claudia Lara-Martinez testified that the plaintiff spoke with them about the OIG investigation, and that they saw him speaking to other employees about it. Sheryl Jones testified that two days before the disciplinary hearing the plaintiff

approached her in an "inappropriate and unprofessional manner," showed her the notice of the hearing, and "accused her in an angry tone" of reporting to defendant Ridgeway her concerns regarding the organization of a Multi-cultural gala event. Ms. Jones testified that the plaintiff asked her why she did not come to him first with her concerns, and stated, "You have caused me problems." Ms. Jones found the plaintiff's approach to be "intimidating and disturbing." The plaintiff admitted that he spoke with Ms. Jones, but contends that he did not try to persuade or intimidate her. The plaintiff does not dispute that he was notified of the ongoing investigation by the OIG, or that he was warned in April 2012, by a member of the OIG staff, and again in June 2012, by the hearing officer, Ms. Anderson, that questioning staff about the investigation could violate the Whistleblower Act and that he needed to stop interfering with the investigation.

B. Evidence of Discrimination

As noted, the hearing officer's findings promptly led to the termination of the plaintiff's employment contract as an administrator. To counter those reasons, the plaintiff alleges that his supervisors were biased against him because of his Albanian ancestry and his gender.

Ivezaj asserts that, after defendant Ridgeway took over as his superior, she "scrutinized and monitored" him, questioning him about his whereabouts and absences from work in a manner that she never did with the other five assistant superintendents that reported to her — Jack Elsey, Rebeca Luna, Alvin Wood, Derrick Coleman, and Wilma Costen. The plaintiff contends that, throughout his tenure under Ridgeway, he was subjected to a "hostile work environment" and "unfair treatment" because of "pedagogical issues" between himself and Ms. Ridgeway concerning the content and scope of the multi-lingual and multi-cultural education program within the district. He states that Ridgeway frequently "expressed dislike of [him] as an Albanian-American," and "stated [her]

dislike of [him] for [his] background at every cabinet meeting." The plaintiff also asserts that African-American assistant superintendents Derrick Coleman and Alvin Wood were "given the privilege of being in charge" when defendants Ridgeway and Mobley-Woods were absent, and that Coleman and Wood were entrusted with other "lead roles" and allowed "leniency" and "preferential treatment," but Ivezaj never was given the same treatment, even though he "had seniority in the cabinet."

In June 2012, the plaintiff met with Ridgeway in her office and she said to him, referring to her relatives David and Daniel, who were students at a school where the plaintiff formerly was a principal, "They told me about you and I don't know about you Albanians." Ridgeway stated in cabinet meetings with other assistant superintendents present, "Frano is my problem child," and during those meetings, Ridgeway frequently would interrupt the plaintiff and cut him off while he was speaking, preventing him from discussing his pedagogical views, while she allowed other, non-Albanian fellow superintendents ample time to discuss their ideas. The plaintiff asserts that Ridgeway also referred to him using such phrases as "Frano's mafia," "Frano's kingdom," or "Frano's connections," and he contends that defendants Washington, Beard, and Mobley-Woods also used these phrases. Ridgeway also referred to the plaintiff using phrases such as "Albanian connections," and "You Albanians."

During an interrogation of the plaintiff by defendant OIG Special Investigator Marilyn Beard, Ms. Beard made a reference to the plaintiff using the phrase "you Albanian men," and she stated that she "had a dislike of men, particularly 'foreigners' like [plaintiff] who 'think they are in charge.'" During conversations between the plaintiff and Ms. Beard she "visibily reacted" to his manner of speaking and acting "as an Albanian man" "by furrowing her brow and wincing."

District Human Resources Executive Director Lauri Washington referred to the plaintiff as "mafia man," "macho man," and "anti-women."

While on a District trip to Puerto Rico, the plaintiff accompanied defendant Shirley Mobley-Woods on a shopping trip, and, when he told her he was going back to his hotel room, she addressed the plaintiff as "You stubborn Albanian."

The plaintiff has not furnished evidence of ethnic bias by the human resources chief, Vicki Hall, or the hearing officer, Mary Anderson.

C. Procedural History

The plaintiff filed his complaint on June 10, 2014 and a first amended complaint on September 23, 2014. The complaint sets forth claims for (1) violating 42 U.S.C. § 1983 (Count I), (2) gender and national origin discrimination contrary to Title VII and the Michigan counterpart (Count II); and (3) breach of contract (Count III). Discovery closed on March 31, 2015.

Defendants Detroit Public Schools, Karen Ridgeway, Lauri Washington, and Shirley Mobley-Woods filed an answer to the first amended complaint on December 9, 2014. At oral argument on the motion for summary judgment, the plaintiff acknowledged that defendant Marilyn Beard never was served with the summons and complaint, and that defendant has been dismissed from the case.

The remaining defendants filed a motion for summary judgment, asking that the amended complaint be dismissed. However, they offered no argument directed to the claims in Counts I or III, and they were not able at oral argument to explain their failure to do so.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual

material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

A.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[] or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). The Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et seq.*, prohibits the same conduct. "Cases brought pursuant to the [Elliott–Larsen Civil Rights Act] are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

To prove sex or national origin discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against him and that sex or national origin was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). These elements may be established by direct or circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

The defendants argue that the plaintiff has not produced any direct evidence of discrimination, because he has presented at most a series of "errant comments" that were not made by either hearing officer Mary Anderson, or the ultimate decision maker in the plaintiff's termination, Vicki Hall. The defendants contend that any discriminatory animus on the part of defendants Ridgeway, Washington, or even inspector Beard, cannot causally be connected to the decision to terminate, where the recommendation was made by an independent hearing officer after considering the testimony of more than a dozen witnesses and numerous documentary exhibits, and where the recommendation was reviewed and approved by the senior officer of the District's Human Resources division. The plaintiff insists that he has offered "direct evidence" in the form of the derogatory statements relating to his national origin by defendants Ridgeway and Mobley-Woods.

"Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008); *see also Yazdian v. ConMed Endoscopic Technologies, Inc.*, --- F.3d ---, 2015 WL 4231698, at *9 (6th Cir. July 14, 2015) . "'Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007) (quoting *Johnson*, 319 F.3d at 865). Direct evidence is a manifestation of actual discriminatory intent by a decision maker, "such as an explicit statement" that the employer was acting on the basis of a protected status. *Imwalle*, 515 F.3d at 544. "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).

Contrary to the plaintiff's position, none of the various comments that he ascribes to the individual defendants constitute direct evidence of discrimination, because, even if deemed to be evidence of some form of animus, none of the comments were directly related to the employment decision in question, and none of them state any actual intent or motive by any of the defendants to make the challenged termination decision based upon the animus expressed.

Moreover, the discriminatory or retaliatory animus of a coworker is not usually relevant to whether the employer violated Title VII, and the only relevant beliefs or motivations are those of the actual decisionmaker, usually a supervisor or manager. *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of

demonstrating animus." (quotation marks omitted)); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("[A] statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."); *cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (concluding that Congress "evince[d] an intent to place some limits on the acts of employees for which employers . . . are to be held responsible" under Title VII).

However, under the so-called "cat's paw" theory, liability may attach to the employer where "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006). "Under this theory, the subordinate, not the nominal decisionmaker, is the driving force behind the employment action." *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008). "When a decisionmaker acts in accordance with a retaliator's bias without himself evaluating the employee's situation, the retaliator clearly causes the tangible employment action, regardless of which individual actually enforces the adverse transfer or termination." *Ibid.* (citations and quotation marks omitted).

Nevertheless, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's discriminatory animus and the adverse action is severed. *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992); *see also BCI Coca-Cola*, 450 F.3d at 485 (explaining that the "plaintiff could not prevail because the decisionmaker had conducted an independent investigation of the facts, rather than relying entirely on the recommendation of the biased subordinate"); *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 725 (8th Cir. 1998) (affirming summary judgment for employer school district because the board had engaged in

an independent investigation rather than rely simply on the desires of school administrators).  "By making a decision based on an independent investigation, the decisionmaker confirms that he is acting as a true agent of the employer and not a mere conduit of the subordinate."  *Roberts*, 283 F. App'x at 333.  "The question becomes, then, whether the investigation . . . was an independent one or merely a facade."  *Ibid.*

None of the comments that the plaintiff attests were made to him about his national origin or gender were made by the hearing officer who reviewed the charges at the disciplinary hearing, the ten witnesses besides the individual defendants who testified regarding his conduct, or the senior human resources officer who made the ultimate decision approving the recommendation to terminate.  The plaintiff has offered no evidence that suggests that the decisionmakers' termination decision was influenced by the bias exhibited by Ridgeway, Washington, Beard, or Mobley-Woods.  And the plaintiff has not shown by any credible evidence that the decision by hearing officer Mary Anderson or Chief Human Resources Officer Vicki Hall to terminate the plaintiff's administrative employment contract was motivated by anything other than an honest belief in the truth of the charges that Anderson found at the disciplinary hearing.  "An employer's pre-termination investigation need not be perfect in order to pass muster under the rule."  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (6th Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).  "The key inquiry is instead 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'"  *Ibid.* (quoting *Seeger*, 681 F.3d at 285).  "[T]o rebut an employer's invocation of the rule, the plaintiff must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.'"  *Ibid.* (quoting *Seeger*, 681 F.3d at 286).

The plaintiff has offered nothing to sustain any claim that either Anderson or Hall were in any way "duped" by the individual defendants into terminating the plaintiff. Anderson considered the testimony of more than a dozen witnesses who appeared at the disciplinary hearing and more than forty documentary exhibits, as well as the testimony and arguments presented by the plaintiff himself, when she produced her findings and conclusions. Hall, in turn, considered the extensive written summary of the proceedings prepared by Anderson, and Anderson's conclusions that the plaintiff had committed the serious work rule violations described in the report, when independently deciding whether to adopt the recommendation for termination. The plaintiff has not offered any evidence that Anderson, Hall, or any of the witnesses that appeared at the hearing, other than Ridgeway and Beard, harbored any discriminatory animus at all toward him.

Moreover, the plaintiff has not offered any evidence that defendant Mobley-Woods participated in either the hearing or the ensuing decision process at all, he has not suggested any evidence showing that defendant Ridgeway had any hand in the decision making process after the hearing, and he has not offered any facts to rebut defendant Washington's testimony that her role after the hearing was limited to discussing with Anderson the recommendation stated in the hearing officer's report and conveying that recommendation to Hall for consideration.

Even accepting the plaintiff's proffered evidence of animus by the individual defendants in the most charitable light and assuming that they harbored some unlawful ill will toward him, the plaintiff simply cannot establish that the purported animus had any effect on the final termination decision, where the decision was not made by any of the named defendants.

None of the testimony regarding any of the various comments made by the defendants suffices to show that the ultimate decision makers in the plaintiff's termination harbored any animus

toward the plaintiff, discriminatory or otherwise. The plaintiff has not shown direct evidence of discrimination.

B.

In the absence of direct evidence, Title VII claims are subject to the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). If the plaintiff does so, "[t]he defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action." *Id.* If the defendant offers a legitimate motive, then "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* The plaintiff may establish pretext by showing that the employer's stated reason either (1) has no basis in fact, (2) was not the actual reason for the action, or (3) is insufficient to explain the employer's action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

The defendants argue in passing that the plaintiff has not established a prima facie case of discrimination. However, the main focus of their argument is on the legitimate reasons for firing the plaintiff and the absence of any pretext.

There can be no question that the manifold charges identified by the hearing officer constituted legitimate reasons for the school district's adverse action against the plaintiff. Even leaving aside the less consequential charges such as the violation of the District's password sharing policy, the plaintiff's unreported absence from one day of work, and his failure to report his drunken

driving conviction, the plaintiff has failed to put forth any sufficient evidence to show that the other serious violations of District policies that the hearing officer found he committed were either devoid of any factual basis, insufficient to justify his termination, or not actually relied upon by the ultimate decision maker in his case.  In particular, the violations of the nepotism policy, contracting and procurement policy, and P-Card usage policies all certainly qualify as matters that should have been, and evidently were, of the utmost concern to a school district in such a precarious financial condition at the time of the plaintiff's conduct and termination that it had been forced into the stewardship of an emergency financial manager.

In particular, the hearing officer highlighted as a "serious concern" the charge that the plaintiff repeatedly lied about and misrepresented or concealed the fact that he was related to his niece, Liria Ivezaj, during the course of her hiring into a department that he oversaw, and while he was actively engaged in recommending and authorizing her hiring.  The plaintiff does not offer any substantive rebuttal to the factual basis of this charge, but relies solely on his strained reading of the Conflict of Interest policy, which he contends does not specifically include "niece" within the definition of "relative."  That reading, however, neglects the overriding duty expressly imposed on all employees under the policy, which requires proactive disclosure of any "matters that may give the appearance of a conflict of interest."  Moreover, the District regarded its stance on nepotism as a sufficiently serious concern that a more explicit and broader prohibition was incorporated into an express term of the plaintiff's employment contract, which prohibited him from directly or indirectly supervising any member of his "immediate family," specifically including "niece" in the definition of that term.  The plaintiff does not deny that, in response to pointed questioning from the District's Human Resources division he replied that he was "not related" to his niece.  That was a lie.  And

it was a lie that plainly was intended to procure the hiring of Ms. Ivezaj into a position that she was not allowed to occupy under the terms of the plaintiff's employment contract.

The plaintiff points to the treatment of another assistant superintendent, Rebeca Luna, who also had immediate relatives under the District's employ. However, the plaintiff has not offered any evidence that Luna failed to disclose the relationship, or that the employment was not thereafter authorized by the District, or that Luna outright lied about the relations. The fact that another employee may have been in ostensible violation of the nepotism policy does not tend to show that the District's decision to call out the plaintiff for his deceitful conduct was not the actual reason for its adverse action.

The hearing officer similarly highlighted what she found to be serious violations of the District's contracting and procurement policy, based on evidence that the plaintiff disclosed to an outside vendor involved in a competitive bidding process the standing of that vendor in both performance evaluations and competitive pricing proposals relative to its competitors.

As to the contracting and procurement policy violations and the misuse of his P-Card purchasing authority, the plaintiff contends essentially that the hearing officer erred and should have accepted his version of events as opposed to the evidence presented by the District's investigator and the other witnesses at the hearing. However, even if the hearing officer was, in fact, mistaken in some of her findings, that is not sufficient to establish that her findings and conclusions were unsupported by any sufficient factual substance, or were so at odds with the evidence presented that they could not reasonably be viewed as correct.

Under the "honest-belief" rule discussed above, the employer is entitled to summary judgment on the pretext issue even if there is evidence that the hearing officer may have been

mistaken in some of her findings. The plaintiff argues that the hearing officer erred in concluding, on the basis of the evidence and testimony presented at the hearing, that he had violated several of the specific work rules cited in her findings and conclusions, and he urges the Court essentially to reexamine and reweigh the evidence to determine whether the violations occurred. But that argument "is ultimately irrelevant to the honest-belief analysis," *Loyd*, 766 F.3d at 591, because the employer who has conducted an adequate investigation and review of the allegations of misconduct is entitled to summary judgment on the issue of pretext under the honest-belief rule "even if its conclusion is later shown to be mistaken," *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). The plaintiff does not dispute that the hearing officer made her findings after a day-long hearing, during which she heard considerable testimony and reviewed numerous documents relating to the charges. The plaintiff was represented by counsel at the hearing and was allowed to present his rebuttal to each of the charges, which was noted in the hearing officer's report. "In sum, the [employer] took witness statements and made a reasonable assessment of the available evidence before terminating [the plaintiff]. The law does not require [it] to do anything more." *Loyd*, 766 F.3d at 591.

C. Retaliation

The plaintiff also argues that he has established a *prima facie* case of retaliation, although he did not plead that theory of liability in the amended complaint. His argument is based on his contention that defendant Ridgeway retaliated against him for (1) suspending two students who were related to Ms. Ridgeway, during the plaintiff's tenure as principal of a school that the boys attended; and (2) "vigorously trying to further Multi-cultural and Multi-lingual activities, while teaching English," which the plaintiff contends "went against the African-Centric regime that Ms. Ridgeway

and others were a part of." As to the suspension of Ms. Ridgeway's young relatives, the plaintiff concedes that the discipline "was not in close temporal proximity with the adverse employment action complained of," but he asserts that was because "Ms. Ridgeway only recently came into a position of superiority where she [had] the authority to procure the plaintiff's termination and demotion."

Title VII prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). In order to make a *prima facie* case of retaliation, the plaintiff must show that (1) he engaged in protected activity; (2) the defendant knew he exercised his rights; (3) the defendant took adverse employment action against the plaintiff; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012). (citing *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)).

The plaintiff does not get out of the gate on this claim. "Protected activity" under Title VII consists of "opposition" to an employment practice made unlawful under the Act, which may include "'not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.'" *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). As specific examples of his "protected activity" the plaintiff cites only (1) his suspension of two students who were relatives of defendant Ridgeway, during the plaintiff's tenure as a school principal; (2) his advocacy of "Multi-lingual and Multi-cultural" education programming, as opposed to defendant Ridgeway's preferred "African-Centric" programs; and (3) his unsuccessful attempts to meet with District Emergency Manager Roy Roberts "to discuss the

way he was being discriminated against by Ms. Ridgeway." The first two activities do not comprise any form of opposition to an unlawful employment practice and cannot be construed as constituting a complaint of unlawful activity prohibited by Title VII. As to the last, the plaintiff contends that he never was able to meet with Mr. Roberts, and he does not cite any facts or testimony from the record to show the substance of any "discussion" that he ever had, or tried to have, with the emergency manager. "Title VII does not protect an employee [] if his opposition is merely a 'vague charge of discrimination.'" *Yazdian*, 2015 WL 4231698, at *6 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). Moreover, the plaintiff has not offered any facts to suggest that either the hearing officer or the ultimate decision maker in his case were aware of any of the alleged "protected activity" when the decision to terminate him was made.

D. Hostile Work Environment

Finally, the plaintiff contends that he suffered a "hostile work environment" both as a result of the derogatory and discriminatory comments made to him by the individual defendants and because after he was demoted to a teaching position he was "subjected [] to further ridicule" when "he was continuously asked by his students why he was no longer in management," and when he "experienced a multitude of questions from the students regarding his demotion." The plaintiff contends that he was "constructively discharged" as a result of the humiliation that he felt following his demotion, and that he has received ongoing treatment for depression, PTSD, and suicidal thoughts, all resulting from his ordeal.

Once again, the plaintiff did not plead this theory of liability in his amended complaint. Nonetheless, Title VII protects employees who suffer workplace conditions "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). The plaintiff must establish that harassment was "ongoing," "commonplace," and "continuing." *See Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 333–34 (6th Cir. 2008). But "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

None of the alleged comments described by the plaintiff, made on various occasions, serve to show that he was faced with workplace conditions "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks omitted). Even assuming that the alleged comments were "ongoing," "commonplace," and "continuing," *Hawkins*, 517 F.3d at 333-34, none of the alleged "conduct [is] severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive," *Harris*, 510 U.S. at 21. The plaintiff also contends that he was subjected to "hostile" conditions after he accepted the teaching position, resulting from relentless questioning by students about the circumstances of his demotion. The plaintiff has not offered any facts to show how any of the alleged "distress" that he suffered after his return to a teaching position resulted from any conduct of the individual defendants.

III.

The plaintiff has not presented admissible evidence that creates a triable issue of fact on the essential elements of the claim presented in Count II of the amended complaint.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #44] is **GRANTED**.

It is further **ORDERED** that Count II of the amended complaint, only, is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 17, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 17, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI